**In the Matter of the Application of the STATE OF NEW YORK, by Robert ABRAMS, Attorney General of the State of New York, Petitioner,**

v.

**CITIBANK, N. A., Respondent.**

**Pursuant to Executive Law Section 63, Subdivision 12.**

**No. 81 Civ. 7273 (ADS).**

United States District Court, S. D. New York.

May 3, 1982.

Robert Abrams, Atty. Gen., New York City, for petitioner; Melvyn R. Leventhal, Asst. Atty. Gen. In Charge, Bureau of Consumer Frauds and Protection, Stephen Mindell, Herbert Israel, Sara E. Nathan, New York City, of counsel.

Shearman & Sterling, New York City, for respondent; Danforth Newcomb, Mark P. Zimmett, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

The Attorney General for the State of New York has moved to remand this action, originally brought in the Supreme Court, New York County, under New York Executive Law § 63(12). The case was removed to federal district court by defendant Citibank, under 28 U.S.C. § 1441 (1976). The motion to remand turns on whether federal jurisdiction exists in à case consisting of a state cause of action founded exclusively upon allegations of illegality under federal law.

Executive Law § 63(12) empowers the Attorney General to seek injunctive relief, restitution, and damages for repeated or persistent fraud or illegality in the transaction of business. Pursuant to the requirements of § 63(12), this civil action was commenced by the filing of a petition alleging that Citibank has repeatedly acted in a fraudulent, illegal, and unconscionable manner with respect to certain transactions at its Automatic Teller Machines (ATMs). The petition asserts that many Citibank customers, in the course of banking transactions at ATMs, have been victimized by a criminal scheme resulting in unauthorized ATM cash withdrawals from their accounts. The Attorney General alleges "persistent illegality" under § 63(12) because of Citibank's refusal to reimburse customers who have lost funds as a result of the scheme. The petition describes the scheme as follows:

a) The criminal stands at the customer service telephone situated between two ATMs and appears to be speaking to a CITIBANK service representative. The customer enters, goes to one of the machines (machine # 1), and enters ("dips") his card. The criminal tells the customer that machine # 1 is out of order; the criminal urges the customer to use machine # 2. The customer does so, i.e., he dips his card in machine # 2 without first clearing machine # 1. As a result, the customer has activated both machines.

b) The customer proceeds with his transaction at machine # 2. However, unknown to the customer, the criminal is observing, usually over the customer's shoulder, the customer's Personal Identification Code (PIC).

c) After learning the customer's PIC, the criminal enters it into machine # 1. He then asks the customer's assistance by stating something to the following effect: "Customer service says maybe it's my card that's the problem. They'd like you to use your card (on machine # 1) 'to see if it will clear the machine.'"

d) The customer, wishing to cooperate with the CITIBANK service representative, permits his Citicard to be dipped once again and possibly even thereafter. Thus, the criminal has duped the customer into performing the three tasks leading to a cash withdrawal. [The three tasks are: first, dipping the card, then entering the PIC number, and then dipping the card again.] The customer feels secure in cooperating since he knows that he has not revealed his PIC.

Defendant's Verified Petition for Removal, Exhibit A, ¶ 14.

The Attorney General sues on behalf of two classes of Citibank customers. "Class A" complainants are customers who discovered withdrawals on their accounts as a result of the scenario described in the petition. "Class B" complainants are customers who used ATM, and also claim that unauthorized withdrawals have been debited against their accounts. But Class B customers do not recall the sequence of events described by Class A customers. Some Class B customers claim that "no other person was present in the CITICARD Banking Center at the time of their own acknowledged transaction"; others claim that if another person was present they did not dip their cards for the other person or that they dipped their cards for the other person only once and not twice as required to complete a cash withdrawal transaction. The manner in which withdrawals were accomplished from the accounts of Class B customers is not explained, but all the customers claim that the unauthorized withdrawals occurred on the ATM adjacent to the one used by the customer and immediately after a bona fide transaction by the customer.

The petition alleges that Citibank has responded to the Class A customer complaints by acknowledging the scheme as described above but insisting that it is not liable for the withdrawals, since the customers caused the loss by permitting (albeit unwittingly) the thieves involved to use their Citicards. The petition also alleges that Citibank insists that Class B complainants are victims of the same scheme that bilked Class A customers. According to the petition, Citibank has "failed to investigate further the possibility of fraud or error" with respect to Class B complaints; has debited allegedly victimized customers' accounts in the amount of the disputed withdrawals plus an overdraft charge for checks subsequently drawn on insufficient funds prior to the customers' discovery of the allegedly unauthorized withdrawals; and has provided "inadequate and ineffective safeguards against the scheme."

Recognizing that the "application of existing consumer protection legislation" to electronic fund transfers "is unclear," Congress enacted the Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.* (1978), "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." 15 U.S.C. § 1693. The petition filed by the Attorney General explicitly pleads violations of EFTA and Regulation E, which was promulgated thereunder by the Federal Reserve Board.

Under the heading "Causes of Action—Customers 'A' and 'B'," paragraph 29 of the petition alleges that respondent's failure to recognize withdrawals made in the course of the criminal scheme as unauthorized and to assume liability for them violate "such customers' rights provided by 15 U.S.C. §§ 1693 *et seq.*, ('Electronic Fund Transfers Act') [including §§ 1693a(11), 1693f, and 1693g] and regulation E issued pursuant thereto by the Federal Reserve System." Specifically, § 1693a(11) defines the term "unauthorized electronic fund transfer." § 1693f prescribes the procedure a financial institution should follow to resolve errors brought to its attention by a customer. And § 1693g sets out the circumstances in

which a customer will be liable for an unauthorized transaction and places the burden of proving the customer's liability on the financial institution in any action involving such liability. Paragraph 30, under the same heading, alleges that respondent's refusal to conclude that the accounts of customers "A" and "B" were not in error "violated such customer's rights provided by 15 U.S.C. § 1693 *et seq.* [including § 1693f] and the regulation...." Paragraph 31 alleges that, as a consequence of the violations of federal law outlined in the previous causes of action, "CITIBANK has engaged in repeated illegal conduct within the meaning and intent of Executive Law Section 63 Subdivision 12." By grounding its allegations of repeated illegal business practices on violations of EFTA, a federal statute, the Attorney General has incorporated EFTA, as an essential part of the claim, into the cause of action created by the State under Executive Law § 63(12).

The second cause of action, set forth in paragraph 32, alleges that Citibank's failure to adopt reasonable safeguards against the criminal scheme, after learning of its existence, violates EFTA and Executive Law § 63(12). Here, too, federal law is made an essential part of the state-law claim.

The two remaining causes of action appear under separate headings limiting their applicability to "A" and "B" customers respectively. The third cause of action, under the heading "Customers 'A' Only," alleges that Citibank's failure to post warnings about the criminal scheme coupled with its refusal to assume liability for the losses suffered by its customers, constitutes an unfair and unconscionable business practice in violation of Executive Law § 63(12). (Paragraph 33) A fourth cause of action, brought on behalf of "B" customers, alleges violations of the EFTA requirement of a good faith investigation of customers' allegations of error (paragraph 34) and then alleges that this failure constitutes repeated illegal conduct under Executive Law § 63(12). (Paragraph 35) The last paragraph alleges that unless relief is granted the harm to the public will continue. (Paragraph 36)

The removal statute, 28 U.S.C. § 1441(a), provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the [appropriate] district court of the United States...." A district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1980).

Petitioner urges that remand is appropriate in this case, since the causes of action in the complaint are state-created. In support of this view, petitioner relies heavily on Justice Holmes' formulation of "arising under" jurisdiction in *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 36 S.Ct. 585, 60 L.Ed. 987 (1916). According to Holmes, "[a] suit arises under the law that creates the cause of action." *Id.* at 260, 36 S.Ct. at 586. But Holmes' formulation has been modified. *See* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 873–890 (1973). Only five years after *American Well Works*, the Supreme Court in *Smith v. Kansas City Title and Trust Co.*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), recognized "arising under" jurisdiction over a state-created cause of action. In *Smith*, a shareholder of a trust company brought an action under state law to enjoin the company from investing in certain federal bonds that plaintiff alleged were an improper investment because they had been issued unconstitutionally. Although the cause of action was entirely state-created, the Court upheld federal jurisdiction over the case because the state claim embraced a federal question. The oft-repeated test for arising-under jurisdiction articulated in *Smith* is:

> [W]here it appears from the bill or statement of the plaintiff that the right to relief depends upon the construction or application of the Constitution or laws of the United States, and that such federal claim is not merely colorable, and rests upon a reasonable foundation, the District Court has jurisdiction....

*Id.* at 199, 41 S.Ct. at 244. Under the *Smith* formulation, arising-under jurisdiction exists in this case over the three causes of action based expressly—and apparently exclusively—upon federal law.

The Supreme Court has held, however, that arising-under jurisdiction is not present merely because the case involves, or even turns upon, a federal question. In *Moore v. Chesapeake & Ohio Railway Co.,* 291 U.S. 205, 54 S.Ct. 402, 78 L.Ed. 755 (1934), the plaintiff asserted a cause of action based on a Kentucky statute for injuries suffered in intrastate commerce by employees of common carriers. The state statute expressly abrogated the defenses of contributory negligence and assumption of risk where a violation of any state or federal statute, including the Federal Safety Appliance Act, contributed to the employee's injury. The Court recognized that the state law incorporated provisions of the federal act, but it nevertheless declined jurisdiction, stating that "a suit brought under the state statute which defines liability to employees who are injured while engaged in intrastate commerce, and brings within the purview of the statute a breach of the duty imposed by the federal statute" is not a suit arising under federal law. *Id.* at 214, 54 S.Ct. at 405.

*Moore* has been reconciled with and distinguished from *Smith* on the ground that incorporation of the Federal Safety Appliance Act into the Kentucky statute merely negated the defenses of contributory negligence and assumption of risk. *Brame v. Ray Bills Finance Corp.,* 85 F.R.D. 568, 589–90 (N.D.N.Y.1979) (citing Greene, *Hybrid State Law in the Federal Courts,* 83 Harv. L.Rev. 289, 324 n. 147 (1969)). Under the now established "well-pleaded complaint" rule, arising-under jurisdiction is not created by the appearance of a federal question in an answer, or in a complaint as the reply to an anticipated defense. *Phillips Petroleum Co. v. Texaco, Inc.,* 415 U.S. 125, 127–28, 94 S.Ct. 1002, 1003–4, 39 L.Ed.2d 209 (1974); *Gully v. First Nat'l Bank,* 299 U.S. 109, 113, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936). Indeed, two years after *Moore* the Supreme Court restated its test for arising-under jurisdiction in a form consistent with *Smith*'s continued viability, and with the "well-pleaded complaint" rationale:

> To bring a case within [arising-under jurisdiction], a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another.

*Gully v. First National Bank, supra,* 299 U.S. at 112, 57 S.Ct. at 97 (citations omitted).

In *T. B. Harms v. Eliscu,* 339 F.2d 823, 827 (2d Cir. 1964), *cert. denied,* 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965), Judge Friendly, writing for the Second Circuit, adopted *Smith*'s "path-breaking" approach. Subsequently, the Second Circuit announced that arising-under jurisdiction exists where "the complaint is for a remedy expressly granted by an act of Congress or otherwise 'inferred' from federal law, or [where] a properly pleaded 'state-created' claim itself presents a 'pivotal question of federal law,' for example because an act of Congress must be construed or " 'federal common-law" govern[s] some disputed aspect' of the claim." *McFaddin Express, Inc. v. Adley Corp.,* 346 F.2d 424, 426 (2d Cir. 1965), *cert. denied,* 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (1966). *Accord, Ivy Broadcasting Co., v. American Telephone & Telegraph Co.,* 391 F.2d 486, 489 (2d Cir. 1968); *Sweeney v. Abramovitz,* 449 F.Supp. 213, 214 (D.Conn.1978).

■ The federal questions present in this case are central to the controversy. The causes of action in the Attorney General's petition, with the exception of that stated in paragraph 33, explicitly allege violations of federal law and allege violations of Executive Law § 63(12) caused by the same alleged violations of federal law. Thus, the federal elements of this case appear on the face of the complaint; unlike those in *Moore,* they do not anticipate a defense or

reply. While Executive Law § 63(12) provides the "cause of action," it is used in three of the four causes of action alleged as little or nothing more than the statutory basis for the Attorney General to bring the suit in a representative capacity. The substance of the alleged violations in the three causes of action incorporating EFTA all involve and require determinations of whether Citibank has violated federal law. If no violation is found, then no violation of state law could be found to have occurred. Construction of EFTA is necessary to resolution of the claims.

The Attorney General insists that he should be permitted to pursue the relief he seeks in the state courts, as the state legislature intended. He is the people's representative by state law, and claims he should be allowed to proceed in the forum designated for the purpose by the legislation, and to seek the remedies specified. He notes specifically the valid observation in *New York ex rel. Lefkowitz v. Transcience Corp.*, 362 F.Supp. 922, 928 (S.D.N.Y.1973), a § 63(12) proceeding, that a state forum for cases brought by the Attorney General is desirable to give "free scope to the police power of the States" in consumer protection cases.

■ The interest of New York State, and of its Attorney General, to litigate consumer protection cases in the courts of the State is ordinarily substantial. Such cases generally turn on common law or local statutory principles, such as unconscionability, and involve remedies that the local courts are experienced in administering. But, as the Court in *Transcience Corp., supra,* noted, the fact "[t]hat after removal the State of New York would be a party plaintiff in the District Court would not, in itself, be disturbing." *Id.* at 927 n.4. It is clear that an action can be removed notwithstanding the fact that a state is the plaintiff. *Ames v. Kansas*, 111 U.S. 449, 463, 4 S.Ct. 437, 443, 28 L.Ed. 482 (1884); 1A J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 0.160 at 192 (2d ed. 1981). *Transcience Corp.* was remanded because its removal had been based solely upon a federal defense; here,

the Attorney General has chosen to make federal law a pivotal aspect of his claim in three causes of action.

■ If removal would incapacitate the Attorney General from representing New York's residents, then a sound basis for refusing removal could be found: the case could not arise under federal law if, under federal law, it were not a case because of a lack of standing in the plaintiff. But as both sides concede the federal test for standing is met here because the state has specifically and reasonably designated the Attorney General as representative of the people. That designation, even if not binding on the issue, should be "accorded great weight." *Land O'Lakes Creameries, Inc. v. Louisiana Board of Health*, 160 F.Supp. 387, 390 (E.D.La.1958) (Wright, J.) The state has acted, moreover, "in circumstances in which it cannot reasonably anticipate that private enforcement will achieve the protection of [its] sovereign interests." *Commonwealth of Pennsylvania v. Porter*, 659 F.2d 306, 316 (3d Cir. 1981) (en banc). The state has a "quasi-sovereign" interest in protecting the welfare of its citizens, *see Commonwealth of Puerto Rico ex rel. Quiros v. Brankamp*, 654 F.2d 212, 215 (2d Cir. 1981), and that interest includes "protection of its citizens from fraudulent and deceptive practices," *Kelley v. Carr*, 442 F.Supp. 346, 357 (W.D.Mich.1977). Nor is there any reason to believe that this Court lacks power to grant any remedy available in state court; indeed, as to this issue, a federal forum is appropriate in the event certain remedies might be inconsistent with federal.law.

Federal jurisdiction in this case is particularly appropriate, since EFTA will be construed here for the first time. No reported decision construing the statute has been found. While federal courts should assume that state courts are competent to decide federal as well as state-law questions, Congress has in its jurisdictional statutes made the federal courts an available and preferred forum for federal law issues, when a plaintiff's claim depends upon their resolution. *See England v. Medical Examiners*, 375 U.S. 411, 415, 84 S.Ct. 461, 464, 11

L.Ed.2d 440 (1964). That policy has special force where the state courts would have no guidance from federal courts on how to decide the federal questions presented, and where the only forum for federal corrective action in the event of erroneous decisions would be the Supreme Court of the United States, on discretionary review. *See also* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *supra*, at 884–85.

The precedents and relevant policies therefore warrant a denial of the Attorney General's motion to remand as to those causes of action incorporating pivotal questions of federal law. With respect to the third cause of action, however, no reference to federal law is present. That claim seems based entirely upon state law. If in fact that cause of action turns solely on concepts such as alleged unfair, deceptive, or unconscionable business practices, then it would involve questions of law and of fact that might not be necessary or appropriate for this Court to investigate and decide. Such a cause of action would turn on equitable principles, different from the more technical legal questions posed by EFTA, and clearly best articulated by the state courts that properly define them. That pendent jurisdiction might exist over the claim does not make its exercise appropriate. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). At this point, a definitive ruling on the issue is deferred, and discovery on the third cause of action is stayed. The parties are directed to consider their positions on pendent jurisdiction, and to brief them for decision by the Court.

Motion to remand denied, but with leave to renew as to the third cause of action after the lack of any relationship of that claim to the claims based on federal law, and the parties' positions on pendent jurisdiction, are established.

SO ORDERED.